The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
May 19, 2022

## 2022COA52

### No. 19CA1491, *People v. Tomaske* — Crimes — Disarming a Police Officer

A division of the court of appeals considers whether a police baton falls under the disarming a peace officer statute. *See* § 18-8-116(1), C.R.S. 2021. Based on the plain language of the statute, the division holds that a police baton is not a "firearm or self-defense electronic control device, direct-contact stun device, or other similar device." The division therefore vacates the defendant's conviction for disarming a peace officer. But the division rejects the defendant's remaining challenges and affirms his conviction for attempt to disarm a peace officer.

COLORADO COURT OF APPEALS                                    **2022COA52**

---

Court of Appeals No. 19CA1491
Montrose County District Court No. 18CR178
Honorable Zachary Martin, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jeremiah Anthony Tomaske,

Defendant-Appellant.

---

JUDGMENT AFFIRMED IN PART
AND VACATED IN PART

Division V
Opinion by JUDGE DUNN
Welling and Yun, JJ., concur

Announced May 19, 2022

---

Philip J. Weiser, Attorney General, Grant R. Fevurly, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, John Plimpton, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     While investigating a reported car theft, police officers chased defendant, Jeremiah Anthony Tomaske, into his home and tackled him.  Face down, Tomaske struggled against an officer and ultimately removed the baton from the officer's duty belt.  He also grabbed — but didn't remove — the officer's holstered firearm.  For this conduct, the trial court convicted Tomaske of disarming a peace officer and attempt to disarm a peace officer.

¶ 2     Tomaske now challenges his convictions, arguing that (1) police batons do not fall under the disarming a peace officer statute, § 18-8-116(1), C.R.S. 2021; (2) the prosecution presented insufficient evidence to disprove his affirmative defense under section 18-1-704.5, C.R.S. 2021 (force-against-intruders statute);[1] and, alternatively; (3) even if the prosecution presented sufficient evidence to disprove that defense, we must still reverse and remand the case to allow the trial court to reconsider the defense because it relied on an incorrect conclusion of law.

---

[1] This statute is colloquially known as the "make my day" law. Though the parties and the trial court refer to it as such, following the supreme court's lead, we refer to it as the force-against-intruders statute. *People v. Rau,* 2022 CO 3, ¶ 2.

¶ 3     We agree with Tomaske that police batons don't fall under the disarming a peace officer statute and thus vacate his conviction for disarming a peace officer.  But we reject Tomaske's remaining challenges and affirm his conviction for attempt to disarm a peace officer.

## I.     Background

¶ 4     Early one morning in May 2018, three Montrose police officers responded to Tomaske's house after receiving a report about a stolen car.  Dispatch reported that the suspect's name was "Joshua Tomaske" and "a male was in the [backyard]."[2]  When they arrived, the officers encountered Tomaske in the backyard.  The officers asked Tomaske if he was Joshua, and Tomaske replied, "[N]o, that's my brother."  Tomaske then told the officers that they had no authority to be there and he had "a right to go home," before bolting inside his house.  With Officer Jonathan Roberts leading, the officers chased Tomaske into the house.  While it's clear that the chase ended with Tomaske face down on the ground with Officer

---

[2] Joshua Tomaske is the defendant's brother.  To avoid any confusion between the brothers, we refer to Joshua Tomaske by his first name.

2

Roberts on him, witnesses disputed how that happened. The trial court ultimately found that Officer Roberts tackled Tomaske from behind.

¶ 5    Tomaske testified that after the tackle, Officer Roberts was on his lower back, causing Tomaske excruciating pain due to his spinal stenosis and herniated disks. As a result, Tomaske said that he reached behind him to try and pull Officer Roberts "higher onto [his] back" to relieve his back pain. He denied that he intended to "do anything specific with [his] hands" or tried to disarm Officer Roberts.

¶ 6    Officer Roberts recalled things differently. He testified that Tomaske reached back and removed the baton from his duty belt. Officer Roberts said that after he knocked the baton away, Tomaske then grabbed for his gun (though he didn't remove it).

¶ 7    During the melee, Officer Roberts suffered an eye injury. Meanwhile, the officers punched and tased Tomaske, eventually subduing him.

¶ 8    Based on this series of events, the prosecution charged Tomaske with second degree assault (for the injury to Officer Roberts' eye), § 18-3-203(1)(c), C.R.S. 2021; disarming a peace

3

officer (for removing the baton from the duty belt), § 18-8-116(1); attempt to disarm a peace officer (for grabbing the gun), §§ 18-8-116, 18-2-101, C.R.S. 2021; and obstructing a peace officer (for the overall encounter), § 18-8-104(1)(a), C.R.S. 2021.

¶ 9 After Tomaske waived his right to a jury trial, the court held a bench trial at which Tomaske, Officer Roberts, and other witnesses testified. Tomaske defended on multiple theories, including that he didn't intentionally grab Officer Roberts' baton or gun, he acted in self-defense, and his actions were justified under the force-against-intruders statute.

¶ 10 The trial court acquitted Tomaske of second degree assault and obstructing a peace officer but convicted him of disarming a peace officer and attempt to disarm a peace officer. After the trial, the court issued a lengthy order explaining its verdict.

¶ 11 The court later sentenced Tomaske to a controlling three-year prison sentence.

## II. Disarming a Peace Officer

¶ 12 "A person commits disarming a peace officer if he . . . knowingly, without justification and without consent, removes the firearm or self-defense electronic control device, direct-contact stun

4

device, or other similar device of a peace officer who is acting under color of his . . . official authority." § 18-8-116(1).

¶ 13    During trial, Tomaske moved for judgment of acquittal on the disarming a peace officer charge, arguing that a baton is not a "firearm or self-defense electronic control device, direct-contact stun device, or other similar device" under the statute.  Because he removed only Officer Roberts' baton, Tomaske argued no evidence supported that charge.

¶ 14    The trial court disagreed, concluding that a baton falls into the "same general grouping" as a "firearm, self-defense electronic control device, direct-contact stun device or other similar device."

¶ 15    Tomaske says the trial court misinterpreted the statute because the phrase "other similar device" doesn't include police batons.  And, he maintains, because the evidence showed that he removed only Officer Roberts' baton, insufficient evidence supports his conviction for disarming a peace officer.

A.    Standard of Review and Legal Standards

¶ 16    We review questions of statutory interpretation de novo. *McCoy v. People*, 2019 CO 44, ¶ 27.  When interpreting a statute, we must give effect to the legislature's intent.  *People v. Rau*, 2022

CO 3, ¶ 15. If the statutory language is clear, we interpret the statute according to its plain and ordinary meaning and apply it as written. *See id.*

¶ 17 When considering the sufficiency of the evidence, "we review the record de novo to determine whether the evidence, when viewed in the light most favorable to the prosecution," was sufficient "to support the conclusion by a reasonable mind" that the defendant was guilty. *People v. Perez*, 2016 CO 12, ¶ 8.

### B. Police Batons Are Not Included Within the Disarming a Peace Officer Statute

¶ 18 Recall that the disarming a peace officer statute criminalizes the removal of an officer's "firearm or self-defense electronic control device, direct-contact stun device, or other similar device." § 18-8-116(1). The parties agree that a baton is not a firearm, a self-defense electronic control device, or a direct-contact stun device. But where they differ is whether a baton falls under "other similar device."

¶ 19 We start, as always, with the statutory text. The legislature used an "or" between "firearm" and the phrase "self-defense electronic control device, direct-contact stun device, or other similar

device."  *See* § 18-8-116(1).  Because the disjunctive word "or" is assumed to demarcate different categories, *see People v. Valenzuela,* 216 P.3d 588, 592 (Colo. 2009), we assume the legislature intended "firearm" to be separate from the other device categories.  *See id.*; *Garcia v. United States*, 469 U.S. 70, 73 (1984) (use of the term "or" indicates an intent to identify separate categories).[3]  That interpretation is reinforced by the statute's evolution.  Indeed, the legislature amended the statute in 2009 to add the phrase "or self-defense electronic control device, direct-contact stun device, or other similar device."  Ch. 305, sec. 3, § 18-8-116(1), 2009 Colo. Sess. Laws 1651.  Before that amendment, the statute only included firearms.  *See* § 18-8-116(1), C.R.S. 2008 ("A person commits disarming a peace officer if he knowingly . . . removes the firearm of a peace officer . . . .").  We therefore don't read "other similar device" to mean devices similar to firearms.

---

[3] We recognize the phrase "self-defense electronic control device, direct-contact stun device, or other similar device" itself contains an "or."  Perhaps because the structure of that phrase indicates the second "or" is used as part of a series of like devices (separated by commas), the People don't argue the second "or" creates an independent category.

7

¶ 20    Rather, we read "other similar device" to mean devices "similar" to electronic control and direct-contact stun devices.  And though this interpretation is firmly rooted in the statute's text, it's equally consistent with the principle of *ejusdem generis*, which instructs that "[w]here general words follow an enumeration of two or more things, they apply only to persons or things of the same general kind or class specifically mentioned."  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012); *see also Winter v. People*, 126 P.3d 192, 195 (Colo. 2006) (applying *ejusdem generis* to interpret the third degree burglary statute).

¶ 21    So does a baton fall within the purview of "other similar device"?  To be sure — and as all agree — a baton is an "other" "device" as those terms are commonly understood.  *See* Webster's Third New International Dictionary 1598 (2002) (other means "an additional one"); *id.* at 618 (defining device as "a piece of equipment or a mechanism designed to serve a special purpose or perform a special function"); *see also Cowen v. People*, 2018 CO 96, ¶ 14 ("When determining the plain and ordinary meaning of words, we may consider a definition in a recognized dictionary.").

¶ 22    But it's not "similar" to an electronic control or direct-contact stun device.  "Similar" means "having characteristics in common" or "very much alike in substance or essentials."  Webster's Third New International Dictionary 2120 (2002).  Electronic control devices and direct-contact stun devices require an electrical shock to subdue an individual.  *See, e.g.,* § 18-12-101(1)(i.5), C.R.S. 2021 (a stun gun "means a device capable of temporarily immobilizing a person by the infliction of an electrical charge").  In contrast, standard police batons — like the one carried by Officer Roberts — don't administer electrical shocks.[4]  Because police batons don't have "characteristics in common" with and aren't "very much alike in substance or essentials" an electronic control or direct-contact stun device, batons aren't "other similar devices" under the disarming a peace officer statute.

¶ 23    Despite the plain statutory text, the People urge a broader construction.  According to the People, "other similar device" includes any weapon carried by a police officer in the course of their

---

[4] The parties don't dispute that Officer Roberts' baton had no electronic features.  We express no opinion on batons that may have electronic features.

duties, including batons. But there are a couple of problems with this unrestrained interpretation. First, it reads "similar" out of the statute, which we can't do. *See Rau,* ¶ 15. Second, it doesn't comport with what the statute says. Had the legislature intended such breadth, it could have simply said "any other device," "any other weapon," or "any other equipment," as other states have done. *See, e.g.,* La. Stat. Ann. § 14:34.6(A) (2021) ("takes possession of any law enforcement equipment"); Mo. Rev. Stat. § 575.153 (2021) ("[r]emoves a firearm, deadly weapon, or less-lethal weapon, to include and including any blunt impact, chemical or conducted energy devices"); N.M. Stat. Ann. § 30-22-27(A) (West 2021) ("removing a firearm or weapon"); 18 Pa. Cons. Stat. § 5104.1(a)(1) (2021) ("removes or attempts to remove a firearm, rifle, shotgun or weapon"); Ky. Rev. Stat. Ann. § 508.160(1)(a) (West 2021) ("[r]emoves a firearm or other deadly weapon"); *cf.* § 18-1-901(3)(e), C.R.S. 2021 (deadly weapon means "[a] knife, bludgeon, or any other weapon, device, instrument, material, or substance . . .").

¶ 24    Similarly, had the legislature intended to specifically include batons in the disarming a peace officer statute, it could've added that piece of equipment or, at the very least, included striking

weapons.  *See* § 18-12-101(1)(a.5) (defining "blackjack" as "any billy, sand club, sandbag, or other hand-operated striking weapon"). That it didn't is further evidence that the legislature didn't intend to include those types of weapons.  *See Auman v. People*, 109 P.3d 647, 656 (Colo. 2005) ("Just as important as what the statute says is what the statute does not say.").

¶ 25    The People next argue that the object of the law — protecting the safety of peace officers — "weighs in favor of a more expansive interpretation of the phrase to include items such as batons."  That may well be the law's purpose but it's not what the statute says. Because we "must presume that a legislature says in a statute what it means," *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992), to the extent the plain language doesn't align with the underlying purpose, it's up to the legislature — not us — to modify the statute, *see Pringle v. Valdez*, 171 P.3d 624, 627 (Colo. 2007) ("If our conclusion does not comport with the General Assembly's intention, it is the legislature, and not the court, that must rewrite it.").

¶ 26    In sum, we hold that police batons do not fall within the purview of the disarming a peace officer statute.  Because no other

evidence supported the conviction for disarming a peace officer, we must vacate that conviction.

### III. Force-Against-Intruders Defense

¶ 27 The force-against-intruders statute recognizes that citizens "have a right to expect absolute safety within their own homes." § 18-1-704.5(1); *see Rau,* ¶ 3.

¶ 28 Under the statute, a defendant is justified in using any degree of physical force against another person if four conditions are met:

> (1) another person made an unlawful entry into the defendant's dwelling;
>
> (2) the defendant had a reasonable belief that such other person had committed a crime in the dwelling in addition to the uninvited entry, or was committing or intended to commit a crime against a person or property in addition to the uninvited entry;
>
> (3) the defendant reasonably believed that such other person might use physical force, no matter how slight, against any occupant of the dwelling; and
>
> (4) the defendant used force against the person who actually made the unlawful entry into the dwelling.

*See People v. Alaniz,* 2016 COA 101, ¶ 14 (quoting *People v. Guenther,* 740 P.2d 971, 981 (Colo. 1987)); *see also Rau,* ¶ 21; § 18-

12

1-704.5(2). A defendant may invoke the statute before trial as a bar to prosecution or at trial as an affirmative defense. *See Rau*, ¶ 20.

¶ 29 Though Tomaske didn't file a pretrial motion to dismiss under the force-against-intruders statute, he moved to dismiss the charges under the statute as part of his motion for judgment of acquittal. After the trial court denied the motion to dismiss, Tomaske raised the statute again as an affirmative defense in closing argument, asserting that the prosecution hadn't met its burden to disprove the defense beyond a reasonable doubt.

¶ 30 In its written order, the trial court agreed that the prosecution had not disproved three of the four conditions required to disprove the force-against-intruders affirmative defense. But it found that the prosecution had disproved the second condition "beyond a reasonable doubt." Specifically, the court found that Tomaske "did not have a *reasonable* belief" that Officer Roberts had "committed a crime in the dwelling *in addition to the uninvited entry*, or was committing or intended to commit a crime *in addition to the uninvited entry*."

¶ 31    Tomaske now contends the court erred because the prosecution presented insufficient evidence to disprove his force-against-intruders affirmative defense.

A.    Standard of Review

¶ 32    Tomaske first argues that because the trial was to the bench, we should apply a "modified sufficiency-of-the-evidence standard." But sufficiency challenges after a bench trial are no different than those after a jury trial. *See Kogan v. People*, 756 P.2d 945, 950 (Colo. 1988), *abrogated on other grounds by Erickson v. People*, 951 P.2d 919 (Colo. 1998); *People in Interest of D.C.*, 2019 COA 22, ¶ 4. We review a sufficiency challenge de novo to determine whether any rational fact finder could accept the evidence as sufficient to support a finding of guilt beyond a reasonable doubt. *Kogan*, 756 P.2d at 950.

¶ 33    In doing so, we give the prosecution — as well as the trial court — the benefit of every reasonable inference that might fairly be drawn from the evidence. *Id.*; *see Adler v. Adler*, 167 Colo. 145, 148, 445 P.2d 906, 907 (1968) (noting that in trials to the bench, it's the duty of appellate courts "to search the record for evidence most favorable" to the trial court's judgment). And we defer to the

fact finder's credibility determinations and its resolution of "conflicts, inconsistencies, and disputes in the evidence." *Kogan*, 756 P.2d at 950. We may not set aside a trial court's verdict when it's sufficiently supported by the evidence, even if the "evidence may be in conflict," *Stewart v. People*, 175 Colo. 304, 307, 487 P.2d 371, 373 (1971), or even if we may have drawn a different conclusion from the same evidence, *see Kogan*, 756 P.2d at 950; *accord People v. Johnson*, 653 P.2d 737, 740 (Colo. 1982).

### B. The Prosecution Presented Sufficient Evidence to Disprove the Force-Against-Intruders Affirmative Defense

¶ 34 Officer Roberts testified at trial that he was investigating a reported crime when he encountered Tomaske. He explained that he was in uniform, identified himself as law enforcement, and displayed no weapons. Officer Roberts testified that after a brief interaction, Tomaske "turned and fled inside the residence." In response, Officer Roberts said that he followed Tomaske into the house because he "believed that [Tomaske] was the suspect that [he] was supposed to be looking for." *See* § 18-1-707(1), C.R.S. 2021 (permitting officers to use physical force if "nonviolent means

would be ineffective in effecting an arrest" or "preventing an escape").

¶ 35    Viewing this evidence in the light most favorable to the trial court's verdict, it sufficiently supports the court's finding that the prosecution disproved Tomaske had "a *reasonable* belief" that the officers had committed, were committing, or intended to commit a crime (other than the trespass).  *See People v. Moore*, 2021 CO 26, ¶ 48 (the reasonableness of a defendant's belief in the necessity of defensive action is determined by the trier of fact); *see also People v. McNeese*, 892 P.2d 304, 313 (Colo. 1995) ("The inquiry for the second requirement [of the force-against-intruders defense] focuses on the reasonable belief of the occupant.  It does not center on the actual conduct of the intruder.").

¶ 36    Tomaske doesn't dispute this evidence.  Rather, he argues that the trial court erred by concluding "as a matter of law" that Officer Roberts "did not commit a crime no matter how excessive his use of force."  But even assuming that's a sufficiency challenge, it's not what the trial court said.  In fact, the trial court rejected the prosecution's argument that Officer Roberts' status as "a law enforcement officer means that he cannot ever be held to have

16

committed crimes."  And it recognized that in certain circumstances, excessive force could be a crime.  It just found that "under the facts as developed at trial," Tomaske's belief that Officer Roberts had committed or would commit a crime wasn't reasonable in this case.  Because the finding has record support, we may not set it aside.  *See Kogan*, 756 P.2d at 950.

¶ 37    Tomaske also points to some potential ambiguity in the trial court's findings that the prosecution disproved the force-against-intruders affirmative defense but didn't disprove the affirmative defense of self-defense (as to the obstruction charge).  Specifically, for purposes of self-defense, the court found that a reasonable person in Tomaske's position could conclude that Officer Roberts "used excessive or unreasonable force when he initiated a physical confrontation by chasing [Tomaske] into the home, and tackling him from behind."  *See People v. Barrus*, 232 P.3d 264, 269 (Colo. App. 2009) ("[S]elf-defense is an available defense against the charge of obstructing a peace officer when a defendant reasonably believes that unreasonable or excessive force is being used by the peace officer.").  And, as already explained, for purposes of the force-against-intruders defense, the court found that Tomaske "did

not have a *reasonable* belief" that Officer Roberts had "committed a crime in the dwelling *in addition to the uninvited entry*, or was committing or intended to commit a crime *in addition to the uninvited entry*."

¶ 38 But, again, though framed as a sufficiency challenge, this contention doesn't go to the sufficiency of the evidence. To the extent the challenge is instead aimed at the adequacy of the trial court's findings, that's different from whether sufficient evidence supports the verdict. *See People v. Shifrin*, 2014 COA 14, ¶ 90 ("[T]he adequacy of a trial court's findings, as contrasted with the sufficiency of the evidence to support them, is tested by whether an appellate court can discern the lower court's rationale . . . ."); *see also R.B. v. L.B.*, 2014 UT App 270, ¶ 21, 339 P.3d 137, 145 (noting a challenge to the adequacy of the court's findings is different from a sufficiency challenge). And to the extent Tomaske's issue is with the consistency of the trial court's findings, he doesn't argue the verdicts are legally or logically inconsistent.

¶ 39 Because Tomaske doesn't otherwise explain how the potential ambiguity in the court's findings undermines the sufficiency of the

evidence supporting his conviction for attempting to disarm a peace officer, we reject Tomaske's sufficiency challenge.

## IV.   Erroneous Legal Conclusion

¶ 40     Tomaske alternatively contends that the trial court premised its force-against-intruders analysis on the erroneous "conclusion of law that a peace officer's use of excessive force is not necessarily a crime."  This error, Tomaske argues, requires us to reverse and remand to the trial court to reconsider his force-against-intruders defense using the correct legal standard.  We are unpersuaded for a couple of reasons.

¶ 41     First, as the People point out, excessive use of force is not, standing alone, a substantive crime.[5]  Rather, subject to section 18-1-707 (which sets forth rules on use of force in making an arrest), "a peace officer who uses excessive force in pursuance of such officer's law enforcement duties *shall be subject to the criminal laws of this state* to the same degree as any other citizen."  § 18-8-803, C.R.S. 2021 (emphasis added).  This statute "establishes a public policy that law enforcement officers have no immunity from

---

[5] Tomaske agreed at oral argument that excessive use of force is not a stand-alone crime.

19

criminal prosecution nor are they accorded any special status with respect to the use of force except in making an arrest." *Bourie v. Dep't of Higher Educ.*, 929 P.2d 18, 21 (Colo. App. 1996). But there's "no indication in [this] statute[] that a public entity is required to file a criminal complaint against a peace officer for the use of excessive force." *Id.*

¶ 42 Second, we disagree with Tomaske that the trial court premised its analysis exclusively on the statement that excessive use of force is not necessarily a crime. Rather, in its force-against-intruders findings, the trial court stated that "[h]owever mistaken or excessive the actions of [Officer] Roberts may have been, the court does not find that they were crimes, *or* that Tomaske had a *reasonable* belief that Officer Roberts was committing or intended to commit a crime."

¶ 43 The court then outlined the evidence it relied on to find that Tomaske didn't have a reasonable belief that the "officers had committed, were committing, or intended to commit a crime" in Tomaske's house. Because the trial court rejected Tomaske's force-against-intruders defense based on the evidence presented, we

20

disagree with Tomaske that we must remand the case to the trial court to reconsider that defense.

¶ 44    Finally, Tomaske suggests the trial court legally erred by not considering whether Officer Roberts knew he wasn't authorized to arrest Tomaske when he tackled Tomaske inside the house.  But Tomaske points us to no authority — and we aren't aware of any — requiring the court to consider that under the force-against-intruders statute.  *See* § 18-1-704.5(2); *see also Rau*, ¶ 21.

## V.    Conclusion

¶ 45    We vacate the conviction for disarming a peace officer and affirm the conviction for attempt to disarm a peace officer.

JUDGE WELLING and JUDGE YUN concur.